IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| JOY J. HERNANDEZ-BUTLER | ) | CASE NO.: 1:17-cv-00068 |
| | ) | |
| Plaintiff, | ) | JUDGE TIMOTHY S. BLACK |
| | ) | |
| vs. | ) | |
| | ) | **MOTION FOR SUMMARY JUDGMENT** |
| IKEA U.S. EAST, LLC, et al. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM**[1]

## I.    THE IKEA EXPERIENCE

The IKEA experience is a unique blend of brand and service creating a direct interaction between what the store offers and what the customer wants through bold signage, product displays, a store layout leading customers from one part of the store to another. With this layout and design, customers can touch, hold, retrieve, and purchase a product in an efficient manner, from entry in the store to leaving in their car. The customer is in control of the shopping experience and the store is set up to accommodate this essential aspect of the IKEA experience.

## II.    THE WEST CHESTER STORE

The West Chester, Ohio IKEA store, located at 9500 IKEA Way, opened over a decade ago and employs many people. The layout of the store is generally consistent with other IKEA stores. The diagram attached as Exhibit A to the Affidavit of Daniel Keith McCrady, submitted herewith, demonstrates that part of the store relevant to this case.

---

[1] As the Court is well aware of the standard for summary judgment, a recitation of the standard is omitted.

## III.   **THE EKTORP SOFA**

The Ektorp sofa is one of the more poplar home furnishing products offered by IKEA. It provides a price point highly competitive to customers, while offering an attractive piece of furniture that can blend into any home and various rooms in a home in a classic design. The Ektorp sofa purchased by the Plaintiff in this case has these approximate dimensions(McCrady Affidavit, at ¶4):

- Length: 85 and 7/8 inches

- Width: 34 and 5/8 inches

- Height: 34 and 5/8 inches

Since the West Chester store opened, over 10,000 Ektorp sofas have been sold. The type of Ektorp sofa sold to the Plaintiff looks like this:



McCrady Affidavit, at Exhibit B. It is available for purchase in the warehouse or sales floor portion of the store in rectangular boxes. Birnbach Report, which is Exhibit A to

the Birnbach Affidavit submitted herewith, at Figure 7. The boxes are arranged in "bays." A bay is defined as the space between two metal support beams which hold up the shelving units in the warehouse. McCrady Depo., at p. 23. The boxed Ektorp sofas are arranged three wide in each bay, and sit on top of a wooden pallet. *Id.* at p. 31. Each individual box is contained in a "bin;" thus, there are three Ektorp bins in every bay. McCrady Depo. at pp. 23, 31.

## IV.    **EKTORP INCIDENTS AT THE WEST CHESTER STORE**

Other than the Hernandez matter, there was only one other Ektorp incident in the West Chester IKEA store. This occurred on July 23, 2011, and involved a customer sitting on a pallet, under a bin/bay, when a sofa fell on her. A state court judge dismissed the case on a motion for summary judgment. This case was called *Dayna Ferguson, et al., v. IKEA Holding U.S, Inc., et al.*, Butler County Court of Common Please Case Number CV 2015 07 1573. The diagram attached as Exhibit A to the Affidavit of Daniel Keith McCrady shows the different location of the Ferguson and Hernandez incidents.

Judge Jennifer Muench-McElfresh granted IKEA's Motion for Summary Judgment in the *Ferguson* case, relying in part on testimony from Mr. McCrady that "the placement of the [Ektorp] box conformed to Ikea's standard procedures and policies," because there was "no evidence to suggest that Ikea had actual or constructive notice that the box might fall from its stored position," and because there was no evidence of "a customer injury similar to Ferguson's." *See* Decision and Entry Granting Defendant's Motion for Summary Judgment, from Case CV 2015 07 1573, submitted herewith.

## V.    FROM LOADING DOCK TO WAREHOUSE

The Ektorp sofas are picked up by customers for check-out in the Warehouse. Products like the Ektorp are placed and replenished in clearly marked bins or bays after having been taken from the staging room to the customer warehouse. Affidavit of Daniel Keith McCrady, at ¶ 2. It is in the warehouse that the customer can touch and control the product for check-out. Birnbach Affidavit, at ¶ 13.

## VI.    THE ACCIDENT

On January 16, 2015, Plaintiff and Gallinger went shopping at the IKEA store located at 9500 Ikea Way, West Chester, Ohio (hereinafter the "IKEA Store" or the "Store"). Plaintiff's Complaint, at p. 2, ¶ 7; Gallinger Depo., at p. 68. Plaintiff went to the store with the intention of purchasing an Ektorp sofa. Plaintiff Depo., at p. 145.

Before going to the store, Plaintiff had researched the dimensions and the weight of the Ektorp sofa, so she was aware that it was both large and heavy. Plaintiff Depo., at pp. 156-57. After doing some other shopping, Plaintiff and Gallinger went to the warehouse area to locate the Ektorp sofa. Plaintiff Depo., at p. 148; Gallinger Depo. at pp. 79, 81.

After locating what she believed to be the correct line of boxes, Plaintiff verified with an IKEA employee that she had indeed located the Ektorp sofa. Plaintiff Depo. at pp. 152-53; Gallinger Depo. at p. 80. The Plaintiff and Gallinger then attempted to load the sofa onto a rolling cart. Plaintiff Depo. at 151, 154.

Plaintiff and Gallinger decided to purchase the boxed Ektorp sofa in the middle of a bay in the IKEA warehouse. Plaintiff Depo. at pp. 163-64, Gallinger Depo. at 93. There were boxed Ektorp sofas directly on either side of the sofa that they had selected for purchase. *Id.*

4

The warehouse area was well-lit, and there were no distractions or diversions in the area while Plaintiff and Gallinger shopped. Plaintiff Depo., at p. 175, Gallinger Depo. at pp. 90-91. They were both able to observe the boxes, bays, and aisles. Plaintiff Depo., at p. 180, Gallinger Depo., at p. 82. Plaintiff confirmed that she could distinguish the pallet from the sofa box. Plaintiff Depo., at pp. 157-58.

Plaintiff and Gallinger attempted to maneuver their selected sofa onto the rolling cart. Plaintiff Depo., at p. 164. Gallinger was on the right side of the box they selected, and Plaintiff was on the left. *Id.* at 163. Thus, each was directly in front of a boxed Ektorp sofa. *Id.* (For convenience, during depositions, these sofas have been referred to as "A," "B," and "C." *See, e.g.*, Gallinger Depo. at 175. Plaintiff was standing in front of sofa A, Gallinger was standing in front of sofa C, and they were attempting to remove and purchase sofa B.)

As they began to remove sofa B, Gallinger noticed that there was tape connecting sofa B to an adjacent sofa. *Id.* at 164. Gallinger cut this tape, and he and Plaintiff then continued their attempts to remove sofa B. *Id.* They pulled sofa B out of the bay and laid it down on their rolling cart. Plaintiff Depo., at p. 168. They then flipped the box on their cart. *Id.* noted at her deposition that she and Gallinger successfully got the sofa onto the rolling cart and that this process was "easier than we thought." Plaintiff's Depo., at p. 171. It was only after they had successfully retrieved a boxed sofa that the incident occurred.

After Plaintiff stood back up from laying down sofa B, sofa A fell and struck the Plaintiff. *Id.* at pp. 171-72. Neither Plaintiff nor Gallinger directly observed what exactly caused sofa A to fall. Plaintiff's recollection is that she saw the box coming out of the corner of her eye a moment before she was hit, but she does not know what caused the

box to fall. Plaintiff Depo., at pp. 171, 179. Gallinger testified that he saw something move out of the corner of his eye, then saw the Plaintiff "go down," and he inferred from this sequence that she had been hit by a box. Gallinger Depo., at p. 152. He did not specifically state that he saw the box strike the Plaintiff, nor did he identify a cause of the incident. *Id.*

There were no other eyewitnesses to the accident, at least as far as any of the parties to this action know, meaning there is no witness who had a clear view of what exactly caused the box to fall towards Plaintiff. Gallinger Depo., at 122-23. There is no clear answer in the record or testimony in this case as to what exactly caused the box that struck Plaintiff to fall. There is no evidence on the record of when the box that struck the Plaintiff was last touched or moved, or who may have last handled it. *See, e.g.*, Gallinger Depo., at pp. 91-92.

Only one other person has been injured by an Ektorp sofa at the IKEA Store since 2010. On July 23, 2011, Dayna Ferguson was injured when she was sitting on a pallet in the warehouse area and she was struck by an Ektorp sofa. McCrady Depo., at pp. 41-42. The facts of *Ferguson* are thus different from those presented in the instant case, as no one in this case sat on a pallet before or after the accident occurred.

Ferguson filed suit against IKEA after that incident, and summary judgment was granted in IKEA's favor in the resulting litigation. *See* Decision and Entry Granting Defendant's Motion for Summary Judgment, Butler County Court of Common Please Case Number CV 2015 07 1573. The basis for summary judgment in IKEA's favor in *Ferguson* was that IKEA had no notice of any hazard relating to the storage of Ektorp sofas in the IKEA warehouse. *Id.* The Ferguson incident occurred in a different location than the incident that is the subject of this case. McCrady Affidavit.

IKEA employees conduct regular safety checks in the warehouse area, including monthly checks of the pallets, and daily inspections of the warehouse for safety hazards McCrady Depo. IKEA's procedures are among the most extensive in the country in the retail industry. Birnbach Affidavit.

IKEA's storage of the Ektorp sofas in the warehouse area meets and exceeds the retail standard of care for store areas where products are available to be touched, controlled, and ultimately purchased by the public. *See generally* Birnbach Affidavit.

## VII. LEGAL ARGUMENT

### A. Plaintiff's Claim must fail because she can identify no Breach of Duty by IKEA.

Plaintiff's sole claim against IKEA is for negligence. Of course, any claim for negligence requires demonstrating the existence of a legal duty, breach of that duty by the defendant, and damages proximately caused by the breach. No reasonable juror could find for Plaintiff as to her negligence claim against IKEA, because the facts do not demonstrate any breach of duty by IKEA.

#### 1. No Duty of Care was Owed, because the Hazard Encountered by the Plaintiff was Open and Obvious.

Under the open and obvious doctrine, the owner of the premises is under no duty to protect persons from conditions which are known to such persons. *Sidle v. Humphrey,* 13 Ohio St.2d 45 (1968). In this case, Plaintiff and Gallinger both confirmed that they had a clear view of the aisle and the boxes in the warehouse. They could see up, down, left, and right, and nothing obstructed or interfered with their ability to observe the Ektorp boxes. The position of the boxes was thus clearly visible to them.

The instant case is very similar to an Ohio case called *McGee v. Lowe's Home Ctrs.,* 2007-Ohio-4981 (Ct. App. 7th Dist.). In, *McGee,* the plaintiff was shopping for

7

vinyl sheet flooring at a Lowe's store. *Id.* at ¶ 3. The flooring was arranged vertically on the shelf, with a bar to keep it upright. *Id.* When she attempted to remove the flooring she wished to purchase, the flooring on display began to fall, causing her injuries. *Id.*

The plaintiff sued Lowe's for personal injuries. Lowe's moved for summary judgment, arguing, *inter alia*, that there was nothing inherently dangerous about storing the flooring vertically, that any danger associated with such an arrangement was open and obvious, and that Lowe's had no actual or constructive notice of any danger associated with this display. *Id.* at ¶ 11.

The trial court granted summary judgment, and the Court of Appeals affirmed. *Id.* at ¶ 13. The Court of Appeals reasoned that the condition of the flooring on the shelves was open and obvious. *Id.* at ¶ 16. In particular, it was obvious to shoppers that manipulating some of the flooring could, conceivably, cause other boxes to fall: "in a warehouse self-help environment, there always remains a possibility that too much fumbling around through merchandise can create an unstable situation where items may become loose or shift positions." *Id.* at ¶ 17.

In *McGee*, the Court also discussed a case called *Hupp v. Meijer Stores Ltd. Partnerships*, 2006-Ohio-2051 (Ct. App. 5th Dist.). In *Hupp*, the plaintiff was shopping for a rug in a "self-help" store. The rugs were arranged vertically. The plaintiff removed a rug and lowered it onto her cart. As she was bent over, another rug fell from the display and struck her, causing personal injuries. The rug grabbed by the plaintiff was not in physical contact with the rug that struck her, as a result of which the Plaintiff could only speculate that her removal of one rug jostled the display and caused another rug to fall. *McGee*, at ¶ 18 (discussing the holding in *Hupp*). On these facts, the Fifth

District Court of Appeals held that any danger posed by the rug display was open and obvious. *Id.*

The facts of *Hupp*, in particular, are nearly identical to the facts presented in the instant case. The analysis, too, is the same. There was nothing concealed or hidden about the position of the Ektorp boxes in the shelving bay. Plaintiff does not know how the boxed sofa fell on her, but she contends that the vertical arrangement of the sofas was a dangerous condition. This argument is unavailing, because any danger associated with the arrangement of the sofas was open and obvious to all shoppers.

### a.  The Condition was Open and Obvious Regardless of how One Interprets Gallinger's Testimony.

The testimony of Gary Gallinger bears special mention in this regard. Gallinger was deposed twice in this case. After his first deposition, Gallinger reviewed his recorded statement provided to IKEA's insurer following the accident, and he wished to be re-deposed in order to discuss the recorded statement.[2] The testimony from his second deposition differs from that given at his first deposition, and indeed from the recorded statement itself. Regardless of which version of his testimony one accepts, however, the condition was still open and obvious.

In his recorded statement, he claimed that the boxes were hanging "six to eight inches off the pallet," and that "almost 1/3 of [the box] was hanging off the pallet. Gallinger Depo., at Plf's Exhibit 1, p. 5.

At his first deposition, he testified that the sofa boxes were "slightly" overhanging the pallet, and he observed this condition before he and Plaintiff removed sofa B:

> "And then I reached in the back to grab the – or reached to
> grab the box, realizing it was setting up on a short pallet and

---

[2] Although this was the stated reason for the deposition, in practice, Gallinger spent much of the deposition contradicting the testimony he had given the first time around, and to what he stated in his recorded interview.

> was sitting in an awkward position in the fact that there was
> three of them on this small pallet where they were not all the
> way on the pallet if that makes sense. They were hanging
> ever so slightly on the edges over."

Gallinger Depo., at p. 93.  Later in that same deposition, he testified that the boxes "did

not look stable in any way, fashion or form in the fact that they were sitting on top - -

they were hanging off of a pallet." *Id.* at 101. He clarified that he observed this condition

before he and Plaintiff approached the boxes, but they approached them anyway,

because, in his words, "we need to remove it" i.e. the box they were going to purchase.

*Id.* at 101-02.

At his second deposition, he testified that he did not notice that the boxes

protruded past the pallet until after they had removed sofa B, and that one-third of the

depth of the box was protruding:

> [Q.] So first, you did not notice the overhang until you
> removed the couch; correct?
> A· Correct.
> Q· And also when the other couch fell off; correct?
> A· Correct.
> Q· So unlike this photo that we have in front of us, there is a
> difference in that the couches, when you were removing
> them that day, almost a third of them were hanging off of the
> edge of the pallet; correct?
> MR. CASOLARI:· Objection.
> A· Correct.

Gallinger Depo., at pp. 181-82. There was significant further discussion during the

deposition of exactly how far the boxes protruded. He was inconsistent on how far the

boxes protruded into the aisle, however, ultimately conceding that he did not know if it

was 3-4 inches or 6-8 inches. *Id.* at 247.

Regardless of which version of his testimony is considered, though, the condition

of the boxes was open and obvious. Exhibit 2 to the second Gallinger deposition, which

Gallinger agreed looked "very similar" to what he saw on the accident date, shows how

the boxes are stored. Gallinger Depo., at p. 174 & Plf. Exhibit 2. If a third of the box had been protruding into the aisle, it would have been clearly visible from this angle.

Exhibit 1 from Gallinger's first deposition depicts a different angle, looking lengthwise down the aisle, as shown below:



Gallinger Deposition, at 124 & Def. Exhibit 1. Gallinger agreed that this fairly and accurately depicted the aisle he observed on the date of the accident. *Id.* Again, from this angle, it is clear that if one-third of a box were protruding into the aisle, this would be clearly visible to shoppers passing by. Plaintiff's testimony indicates she could clearly see and differentiate the boxes, support structures, and pallets as she and Gallinger approached the box, before attempting to remove it. Plaintiff's Depo., at pp. 158-59.

Whether Gallinger, or Plaintiff for that matter, actually saw the overhang before the accident is legally irrelevant. A hazard need not actually be *seen* in order to open and obvious; instead, it must only be *visible*. *Armstrong v. Best Buy Co.*, 99 Ohio St. 3d 79, 80 (Sup. Ct. 2003), is illustrative. In *Armstrong*, the plaintiff tripped over the bracket of a shopping-cart guardrail while entering a Best Buy store. *Id.* at 79. While he did not actually see the rail, he admitted that nothing obstructed his view, and he could have seen it if he looked down. *Id.* at 80. The Court also reviewed photographs of the scene, and found, as a matter of law, that "the rail in question was visible to all persons entering and exiting the store." *Id.* Accordingly, the Court found that the rail was open and obvious.

The same reasoning applies here. Whether or not Gallinger saw the condition, Plaintiff agreed that the boxes, pallets, and support rails were clearly visible, and the photographs of the scene demonstrate that the position of the boxes relative to the support structures was clearly visible to all persons passing through the aisle. Accordingly, any danger relating to the boxes' positions was open and obvious.

### 2.    There were no Attendant Circumstances.

Attendant circumstances are an exception to the open and obvious doctrine. *Cooper v. Meijer Stores, L.P.,* 2007 Ohio 6086, ¶ 13 (10th Dist.)   An attendant circumstance is a factor that contributes to the injury but is beyond the control of the injured party.  *Id.* at ¶ 15.  It may be a distraction or other circumstance that reduces the degree of care that an ordinary person in the same circumstance would exercise.  *Id.* Thus, "[e]ven when a Plaintiff admits not seeing an obstacle because he or she never looked...a jury question may arise if attendant circumstances distracted him or her." *Id.*

In this case, the Plaintiff cannot demonstrate attendant circumstances.

12

1. *Nothing diverted the Plaintiff's attention;*

2. *Nothing distracted the Plaintiff's attention;*

3. *Lighting was not an issue;*

4. *The Plaintiff could see ahead, up, down, to her right, and to her left; and*

5. *There was no other active repair or construction work nearby.*

Plaintiff's Depo., at pp. 174-75. Gary Gallinger, who was present at the scene with the Plaintiff, confirms that there were no distractions or diversions that would have prevented himself and the Plaintiff from observing the sofas in the warehouse bay. Gallinger Depo. at pp. 89-92, 116, 213-16.

The combined testimony of the Plaintiff, and whatever version of events one attributes to Gallinger, reveal nothing more and nothing less than an open and obvious condition without any attendant circumstance. The open and obvious doctrine applies, and is further confirmed by expert testimony.

### 3. IKEA had no Notice of any Issue with the Ektorp Sofas

The duty owed by property owners to business invitees has been explained by the Ohio Supreme Court as follows:

> The occupier must not only use care not to injure the visitor by negligent activities, and warn him of latent dangers of which the occupier knows, but he must also inspect the premises to discover possible dangerous conditions of which he does not know, and take reasonable precautions to protect the invitee from dangers which are foreseeable from the arrangement or use.

*Perry v. Eastgreen Realty Co.*, 53 Ohio St. 2d 51, 52 (1978). The duty owed by a property owner has been further explained as follows:

> To establish that a premises owner failed to exercise ordinary care, the plaintiff must demonstrate one of the following three conditions: (1) the premises owner created the hazard;

13

> (2) the premises owner possessed actual knowledge of the hazard and failed to give adequate notice of its existence or to remove it promptly; or (3) the hazard existed for a sufficient length of time to justify the inference that the failure to warn against it or remove it was attributable to a lack of ordinary care.

*Ray v. Wal-Mart Stores, Inc.*, 2013-Ohio-2684, at ¶ 22, 2013 Ohio App. LEXIS 2662.

Where a plaintiff is unable to establish any of the three methods for demonstrating notice, the premises owner or occupier is entitled to summary judgment because the plaintiff cannot prove a breach of the duty of care to prevent accident or injury. *Szerszen v. Summit Chase Condos.*, 2010 Ohio 4518, ¶ 19 (10th Dist.).

For example, in *Riley v. Alston,* summary judgment was appropriate for premises owners because there was no evidence that the owners had any knowledge that the area of their premises where an invitee fell may have presented an "unreasonable danger" and no evidence that they failed to warn the invitee due to the latent nature of any defects in the area. *Riley v. Alston,* 2013 Ohio 5769 (7th Dist.).

A similar result was reached in *Taylor v. K-Mart Store,* where a patron slipped on water at the entrance to K-Mart. *Taylor v. K-Mart Store,* 2007 Ohio 2094 (2d Dist.). The record in that case was devoid of any facts that K-Mart created the condition, that K-Mart had actual knowledge of the condition, or that the condition existed for a length of time sufficient to warrant an inference that it should have been discovered. *Id.* at ¶ 64. Because there was no evidence to show that K-Mart was on actual or constructive notice of the water on its floor so that it could act to remove it in time to prevent injury to the patron, the court concluded that K-Mart was entitled to summary judgment as a matter of law because it did not owe any duty to the patron at the time of her fall. *Id.* at ¶ 67.

### a.     Actual or Constructive Notice.

Plaintiff may contend that IKEA had actual or constructive notice of a danger relating to Ektorp sofas, because a previous incident occurred wherein a customer was injured by such a sofa. evidence of other incidents may only be admitted of the circumstances of such incidents are "substantially similar" to the circumstances under which the accident occurred. *Surles v. Greyhound Lines, Inc.*, 474 F.2d 288, 297 (6th Cir. 2007) (citation omitted). The burden is on the plaintiff to make a showing that the circumstances of her proffered prior incidents meet this "substantial similarity" requirement. *Id.*

In *Callahan v. Pat's Industrial Catering, Inc.*, 1988 Ohio App. LEXIS 1583 (8th Dist.), the plaintiff was injured while stepping down from a catering truck, and the plaintiff sought to introduce evidence of a prior incident involving another person who was injured while stepping down from the same truck. The Court held this evidence inadmissible, because the prior incident was evidently due to the uneven ground beneath the truck, while the plaintiff's claims alleged negligence due to an exposed door guide. *Id.* at *7. The Court held these claims were too dissimilar for the prior incident to be probative. *Id.*

Applying this law, evidence of the prior *Ferguson* matter should be excluded and disregarded, because it is wholly distinguishable from the instant case. In *Ferguson*, the plaintiff was allegedly struck by a sofa after sitting down on a pallet in the warehouse department of the IKEA store. The Butler County Court of Common Pleas granted summary judgment to IKEA, because there was no evidence that IKEA had any notice of an issue with how Ektorp sofas are positioned for purchase.

That incident occurred four years before the incident that is the subject of this lawsuit, in a different location, and under different circumstances. Multiple Ohio and 6th Circuit cases establish that a few isolated incidents, remote in time and space from the plaintiff's allegations, cannot, as a matter of law, constitute notice to a defendant of a risk of harm. *George v. Woods*, 1987 Ohio App. LEXIS 8351 (12th Dist.) (holding that "evidence of an occurrence which happened two years earlier in a different building" was not even admissible as evidence of notice); *Lykins v. Miami Valley Hosp.*, 157 Ohio App. 3d 291, at ¶ 67 (2d Dist. 2004) (three prior incidents of disease, one of which involved a different disease than that contracted by the plaintiff, were inadmissible as evidence of notice of a danger); *Grossman v. Aristech Chem. Co.*, 1996 U.S. App. LEXIS 22429, at *6 (6th Cir. 1996) (holding that "isolated incidents" of ammonia leaks was insufficient to give "actual or constructive notice" of an "abnormally dangerous condition").

The West Chester IKEA store sells many, many Ektorp sofas, it had been four years since any incident involving an Ektorp sofa, and the prior incident was factually distinguishable from the incident involving the plaintiff. On these facts, IKEA was not on notice of any issue with the Ektorp sofas. Mere incidental and isolated events in the past, with no connection by time (either as to the length of a hazard, or by passage of time), similarity of circumstances, or even geography does not rise to the level of a pattern of danger establishing constructive notice, let alone actual notice.

Ohio cases also hold that evidence of prior occurrences is *inadmissible* on the issue of notice, unless the alleged hazard involves "conditions of permanency, such as defects in substantial structures like buildings, machines, sidewalks and streets. Such evidence is not competent or admissible where it relates to a temporary condition which

16

might or might not exist from one day to the next and where there is no showing that conditions surrounding the prior occurrences persisted and surrounded the occurrence which resulted in plaintiff's injury." *Boles v. Montgomery Ward & Co.*, 153 Ohio St. 381, 386 (Sup. Ct. 1950).

The position of the sofa boxes relative to the bay and the pallet on which they rest can and does vary from day to day, and from hour to hour. By design, the boxes are handled and moved by customers throughout the course of the shopping day. There is no clear explanation in the record of exactly what caused the box to fall, but whatever condition and location the box was in at the moment prior to falling, that condition and location would never be static from day to day. Thus, under the authority of *Boles*, evidence from the *Ferguson* case cannot be admitted, because Plaintiff's claims in this action do not relate to a permanent condition on IKEA's premises.

There is no evidence to establish constructive notice. There is no evidence of the same or substantially similar accidents. There is no evidence of how long any alleged hazard existed, and there is nothing immediate in time to show some connection to this case, and in fact, nothing of a permanent, persistent, or protracted situation to establish constructive notice whatsoever.

### b. Creation of a Hazard.

There is also no evidence that IKEA created the allegedly hazardous condition. Plaintiff's theory, evidently, is that the sofa fell because it was situated too close to the edge of the pallet[3], but there is no evidence as to how the box came to be resting there. Customers are permitted, and indeed encouraged, to touch and control the boxes in the

---

[3] As discussed *supra*, any danger relating to the location of the boxes was open and obvious to the Plaintiff, meaning it is not actionable in any event.

warehouse area. It is entirely possible that another shopper moved the box to where it sat before falling towards the Plaintiff.

### 4. IKEA Met All Applicable Standards of Care

As established by the affidavit of retail expert Jerry Birnbach, IKEA's warehouse or sales floor conditions and policies met or exceeded standards of care for the retail industry. His opinions confirm that IKEA's policies and procedures were fully consistent with the retail standard of care:

a. *IKEA did not deviate from any accepted standards of care in the retail industry where retail customers touch and control products for purchase from warehouse inventory and then take the product to checkout and then out of the store on their own.*

b. *The Ektorp Sofa was transferred from the delivery truck while on a pallet from the receiving area directly to the area of the incident. The carton was not distributed and the sofa was contained safely within the original transatlantic shipping carton. The positioning of the carton was in accordance to all applicable standards of care in the Retail Industry in accordance to IKEA handling of unopened inventory cartons. The Ektorp Sofa remained in its original shipping carton, sized and protected to ensure a safe transfer from the sales floor to the customers transfer to the checkout counter. IKEA provided safe and adequate storage when they presented the product on pallets, within the Industry Standard display system designed for pallets, left more than enough aisle space to work within and navigate, provided a clean floor without any obstructions or hazards, installed efficient and high illumination lighting and continued to monitor on a daily basis a floor inspection specifically designed to find display and product hazards.*

18

c. *IKEA provided safe and adequate storage when they presented the product on pallets, within the industry standard display system designed for pallets, left more than enough aisle space to work within and navigate, provided a clean floor without any obstructions or hazards, installed efficient and high illumination lighting and continued to monitor on a daily basis a floor inspection specifically designed to find display and product hazards;The aisle and the accompanying products were open for customers, obvious in relation to the surroundings in conditions which were neither concealed, and where illumination exceeded industry standards.*

d. *IKEA provided a product presentation that was per industry standard for height off the floor accessibility of 6" or greater, product above 36" height line, product within the base footprint of the display and protruding out into the aisle, carts to transport the product or an option to drive a car to a loading dock where they would be assisted by IKEA staff to load their car.*

Birnbach Affidavit, at ¶¶ 3, 4, 5, 6. IKEA's business practices complied with all applicable standards of care.

### 5.    There is no Evidence of how the Sofa Fell.

Negligence is never presumed, and must be proven. *Martin v. Heinz*, 126 Ohio St. 227, 230 (1931). "The presumption of law is that neither party was guilty of negligence, and this presumption stands until rebutted by evidence to the contrary." *Id.* (citation omitted). "[N]egligence . . . cannot be inferred from the mere fact that an accident occurred." *O'Brien v. Bob Evans Farms, Inc.*, 2004-Ohio-6948, at ¶ 22 (11th Dist.) (citation omitted). Thus, in this case, Plaintiff must make an affirmative showing of what, exactly, IKEA did wrong in order to recover.

In the context of a slip-and-fall case, Ohio courts have held: "a plaintiff will be prevented from establishing negligence when he, either personally or with the use of outside witnesses, is unable to identify what caused the fall." *Cohen v. Meridia Health Sys.*, 2006-Ohio-3593, at ¶ 12 (8th Dist.) (citation omitted). The same principle applies

here. Plaintiff needs to explain what the cause of her injuries was, and that such cause was IKEA's fault, in order to recover.

She cannot do so, because no evidence in the record establishes what caused the box to fall and strike Plaintiff. The only speculative theory advanced by Plaintiff is that the box must have been too close to the edge of the pallet, but if that is true, then this condition was open and obvious to the Plaintiff meaning she cannot recover. There is no theory under which IKEA can be found liable to the Plaintiff.

Finally, there is no evidence of any conduct on the part of IKEA as to the condition presented before the Plaintiff and Gallinger approached the sofas. Summary judgment should therefore be entered in IKEA's favor.

## VIII. CONCLUSION

For all of the foregoing reasons, IKEA is entitled to summary judgment.

Respectfully submitted,

MARSHALL, DENNEHEY, WARNER,
COLEMAN & GOGGIN

By:/s/Samuel G. Casolari, Jr.
SAMUEL G. CASOLARI, JR. (0034410)
312 Elm St. Suite 1850
Cincinnati, OH 45202
P: (513) 372-6802
F: (513) 372-6801
Email: sgcasolari@mdwcg.com
*Counsel for Defendant*

## CERTIFICATE OF SERVICE

Parties who have access to this Court's electronic filing system will receive notice of this filing by operation of that system. The parties may access this filing through the Court's system.

Respectfully submitted,

MARSHALL, DENNEHEY, WARNER,
COLEMAN & GOGGIN

By: /s/Samuel G. Casolari, Jr.
SAMUEL G. CASOLARI, JR. (0034410)
312 Elm St. Suite 1850
Cincinnati, OH 45202
P: (513) 372-6816
F: (513) 372-6801
Email: sgcasolari@mdwcg.com
*Counsel for Defendant*

Date: January 14, 2019