# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

**JOY J. HERNANDEZ-BUTLER,**

      **Plaintiff,**

**v.**

                                      **Case No. 1:17-cv-68**

                                      **JUDGE DOUGLAS R. COLE**

**IKEA U.S. EAST, LLC,** *et al.*,

      **Defendants.**

## OPINION AND ORDER

This cause comes before the Court on the Motion for Summary Judgment (ECF No. 21), Motion to Strike Exhibit 12 (ECF No. 28), and Motion to Strike or Disregard the Testimony of Gary Gallinger (ECF No. 29) filed by Defendants IKEA U.S. East, LLC and IKEA Property, Inc. (collectively "IKEA"). For the reasons discussed more fully below, the Court **DENIES** the Motion for Summary Judgment and **DENIES** both Motions to Strike.

## I.    FACTUAL BACKGROUND

On January 16, 2015, Plaintiff Joy J. Hernandez-Butler ("Hernandez-Butler") and Gary Gallinger ("Gallinger") visited the IKEA store in West Chester, Ohio, with the intent to purchase an "Ektorp" sofa. (Hernandez-Butler Dep., ECF No. 22-1 at PageID 398). Hernandez-Butler had previously researched the Ektorp sofa. (*Id.*). She testified that she was familiar with the dimensions and weight, both of the assembled sofa and of the box in which IKEA sold the unassembled sofa. (*Id.* at PageID 409). (The sofa weighs about 150 lbs. and measures roughly 86x35x35 inches when assembled; boxed, the Ektorp sofa measures about 86x36x18 inches.) According to Hernandez-Butler, she had investigated the box dimensions to make sure that the box would fit in the vehicle available to her to transport the boxed sofa from the store to her home. (*Id.*).

After shopping for other items throughout IKEA's retail space, Hernandez-Butler and Gallinger entered the store's warehouse. (*Id*. at PageID 401). The warehouse is organized by rows of shelving units, which form "bays," i.e., spaces between two of the shelving units' metal support beams. (McCrady Dep., ECF No. 24-1 at PageID 727). The Ektorp bay contains three "bins," each of which contains a single row of individually boxed Ektorp sofas. (*Id*. at PageID 735). As depicted in Figure 1, the boxes are placed vertically, so that they are 86" tall and resting on the end that is 18"x36". They are further oriented so that one of the two large flat sides faces the aisle.



(Figure 1, Pl.'s Memo. in Opp., Ex. 2, ECF No. 25-2 at PageID 831).

Hernandez-Butler and Gallinger located the Ektorp bay and decided to select the boxed sofa in the middle bin. (Hernandez-Butler Dep. at PageID 405, 416–17). With the goal of moving that boxed sofa to their rolling cart, Hernandez-Butler stood in front of the left bin, and Gallinger stood in front of the right bin. (*Id*. at PageID 416). As they began maneuvering the desired sofa box to their cart, Gallinger noticed that tape connected to the box was stuck to the box immediately

behind it (also in the middle bin). (*Id*. at PageID 417). The two paused, Gallinger cut the tape with a key, and they then continued to shift the box from the pallet to the rolling cart. (*Id*.). Once the box was on the cart, Hernandez-Butler and Gallinger took a few moments to adjust the box. (*Id*. at PageID 421). According to Hernandez-Butler, the process of moving the boxed sofa from the bin to the rolling cart was "easier than we thought [it would be]." (*Id*. at PageID 424).

But as Hernandez-Butler began to stand after positioning the box on the cart, the boxed sofa closest to her in the left bin toppled over and struck her. (*Id*. at 424–25). Both Hernandez-Butler and Gallinger saw the box falling in the corners of their eyes, but they also testified that they did not see what dislodged the box and caused it to fall. (*Id*. at PageID 424). Both Hernandez-Butler and Gallinger testified that, so far as they knew, they had not touched the box that fell. (*Id*. at PageID 423, 426; Gallinger Dep., ECF No. 23-1 at PageID 549). Moreover, prior to the accident, Hernandez-Butler did not perceive any instability in the box that fell and struck her. (Hernandez-Butler Dep. at PageID 428–29). As more fully described below in connection with IKEA's Motion to Strike Gallinger's testimony, Gallinger has testified that the Ektorp boxes were positioned on the pallets such that the front Ektorp box in each of the three bins was hanging over the edge of the pallet on which it was sitting, although his testimony has varied somewhat in describing the magnitude of the alleged overhang.

Hernandez-Butler sued IKEA seeking recovery for the injuries she alleges she suffered as a result of the box falling onto her. She brought a single-count complaint, alleging negligence. More specifically, she alleges that, by placing the boxed Ektorp sofas in a vertical fashion, IKEA negligently failed to maintain the warehouse in a manner that was reasonably safe for customers, or alternatively, that IKEA breached its duty to adequately warn customers of the risks associated with the way in which the product was arranged in the bins.

## II.  IKEA'S PENDING MOTIONS

Discovery is now closed. IKEA has filed three motions, which are pending before the Court, a motion for summary judgment and two motions to strike. The motions to strike are directed at two of the pieces of evidence that Hernandez-Butler cited in her opposition to the motion for summary judgment.

### A.  IKEA's Motion For Summary Judgment.

In its Summary Judgment Motion, IKEA claims the undisputed facts show, as a matter of law, that IKEA did not breach any duty owed to Hernandez-Butler. This is so, IKEA claims, for four reasons. First, the hazard that Hernandez-Butler encountered was open and obvious, and thus IKEA had no duty to protect her from it, or to warn her about it. Second, in some tension with IKEA's argument that the hazard was open and obvious, IKEA claims that the undisputed facts also show that IKEA itself did not have any notice of the hazard, and thus had no duty with regard to it. Third, relying on its expert, IKEA claims that IKEA "met or exceeded the standards of care for the retail industry." (PageID 103). Finally, IKEA claims that the record contains no evidence as to what actually caused the sofa box to fall. That is, even if one assumes that the vertical positioning of the sofa box on its shortest, narrowest side and facing outward could cause the box to be unstable, the box would not have fallen without some application of force against the box. IKEA claims that Hernandez-Butler bears the burden of identifying the source of that force. She concedes, both in her brief and at oral argument, that the record contains no evidence on that front. That is, beyond identifying the risk allegedly associated with orienting the box in the way that IKEA did, no one has identified what allegedly bumped or moved the sofa box, thereby initiating the fall. That evidentiary failure, IKEA contends, means that Hernandez-Butler's claim fails as a matter of law.

**B.      IKEA's Motions To Strike.**

In connection with moving for summary judgment, IKEA also filed two motions to strike. Its first motion asks the Court to ignore any testimony from Gallinger on which Hernandez-Butler relies in her opposition, as Gallinger has offered multiple, somewhat varying accounts of the incident. (ECF No. 29). More specifically, Gallinger first gave comments at the store for an incident report, in which he did not mention anything about the position of the boxes relative to the pallet. He then provided a recorded statement to an insurance investigator for IKEA. In that statement, he averred that the front sofa box in each of the three bins was slid forward so that all three front boxes "were hanging six to eight inches off of the pallet, … almost 1/3 of [the box] was hanging off the pallet." (PageID 249). He was then deposed twice during the litigation. At the first deposition, he testified that the boxes were "not all the way on the pallet," but instead were "hanging ever so slightly on the edges over," which he later goes on to characterize as "hanging a good 3 to 4 inches off of the pallet." (PageID 938, quoting Gallinger Dep. Tr.).

At the time of this first deposition, IKEA had not produced the insurance investigation report to Hernandez-Butler. Once IKEA provided that report, Hernandez-Butler arranged a second deposition of Gallinger. At that deposition, after having reviewed his statement to the investigator, Gallinger testified that approximately a third of the box was hanging off the edge, but whether that "was 3 to 4 inches or 6 to 8 inches [was] hard to tell." (PageID 939). According to IKEA, these discrepancies in Gallinger's accounts make his testimony unreliable as a matter of law.

Second, during the litigation, IKEA produced to Hernandez-Butler two incident reports involving Ektorp sofa boxes that allegedly fell on customers. One incident occurred in 2011 at the same IKEA store at issue in this litigation. According to that report, a customer was sitting on a pallet in the warehouse waiting for others in her group to finish shopping when a boxed Ektorp

sofa, stored in the same vertical fashion as the sofa here, fell on her. (ECF No. 25-14). IKEA has not moved to strike that report.

The second incident report, however, which *is* the subject of Defendant's other motion to strike (ECF No. 28), involved an accident in an IKEA store near Seattle (the "Renton Incident Report") that allegedly occurred in 2012. According to that report, a customer was moving an Ektorp sofa box from the front of a bin in the warehouse, when the Ektorp sofa box immediately behind that one toppled forward and struck the customer on his leg. IKEA asserts that, for various reasons, the Court cannot rely on the Renton Incident Report in connection with its consideration of the Summary Judgment Motion.

## III. DISCUSSION

### A. Summary Judgment Standard.

Summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden of establishing that there are no genuine disputes of material fact, which may be accomplished by demonstrating that the non-moving party lacks evidence to support an essential element of its case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir. 1993). To avoid summary judgment, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *accord Moore v. Philip Morris Cos.*, 8 F.3d 335, 340 (6th Cir. 1993). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970); *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (stating that the court must draw all reasonable inferences in favor of the non-moving party and must refrain from making credibility determinations or weighing evidence). Further, the existence of a mere scintilla of evidence in support of the non-moving party's position will not be sufficient; there must be evidence on which the jury reasonably could find for the nonmoving party. *Anderson*, 477 U.S. at 251; *see Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995); *see also Matsushita*, 475 U.S. at 587–88 (finding reliance upon mere allegations, conjecture, or implausible inferences to be insufficient to survive summary judgment).

**B.      Analysis Of IKEA's Summary Judgment Motion.**

Hernandez-Butler asserts a single negligence claim against IKEA. Under Ohio law, to establish negligence Hernandez-Butler must establish that: (1) IKEA owed a duty of care to her; (2) IKEA breached that duty; and (3) IKEA's breach was both a but-for and proximate cause of Hernandez-Butler's injuries. *Lang v. Holly Hill Motel, Inc.*, 122 Ohio St. 3d 120, 909 N.E.2d 120, 122 (Ohio 2009).

As a general matter, the duty that a premises owner owes under Ohio law turns on whether the injured person is an invitee, licensee, or trespasser. Here, all agree that, as a customer in a retail establishment, Hernandez-Butler is an invitee. As to its invitees, a store owner has a duty of reasonable care. This includes duties: (1) to avoid injuring an invitee by negligent activities, (2) to warn invitees of latent or hidden dangers known to the store owner, (3) to make reasonable inspections of the business premises to discover any potential dangers, and (4) to take reasonable precautions to protect invitees from dangers that are foreseeable from the arrangement or use of

the premises. *Flaig v. Wal-Mart Stores East, LP*, No. 1:15-cv-444, 2019 WL 6130864, at *2 (S.D. Ohio Nov. 19, 2019) (citation omitted). But there is an important qualification on those duties; Ohio law holds that a store owner's duty of care does not include a duty to warn customers of, or protect customers from, any "open and obvious" dangers inside the store. *Sidle v. Humphrey*, 13 Ohio St. 2d 45 at ¶ 1, 233 N.E.2d 589 (1968).

Here, as described above, IKEA argues that on the undisputed facts, the hazard at issue was either (i) open and obvious, or (ii) a hazard as which IKEA had no notice, either of which means that IKEA had no duty. Alternatively, IKEA argues that it met all standards of care, meaning that it did not breach any duty. And, finally, it argues that Hernandez-Butler has failed to show what actually caused the box to fall, essentially an argument that the record lacks any evidence that IKEA's alleged breach of a duty was the cause of the injuries that she suffered. The Court addresses each of these in turn.

> ### 1.      IKEA Fails To Establish That It Is Entitled To Summary Judgment On The Grounds That The Hazard Was Open And Obvious.

"[T]he question of whether a particular danger is open and obvious is often very fact-specific, and genuine issues of material fact may preclude summary judgment on the issue." *Weber*, at *4 (citing *Hissong*, 927 N.E.2d at 1167). "Where reasonable minds could differ with respect to whether a danger is open and obvious, the obviousness of the risk is an issue for the jury to determine." *Id.* (citing *Klauss v. Marc Glassman, Inc.*, 2005-Ohio-1306, 2005 WL 678984, at *3 (Ohio Ct. App., 8th Dist.)); *see also Tackett v. Wal-Mart Stores, East, Inc.*, No. 1:05-cv-560, 2007 WL 2668133, at *4 (S.D. Ohio Sept. 6, 2007) (same) (citing *Texler v. D.O. Summers Cleaners & Shirt Laundry Co.*, 81 Ohio St. 3d 677 (Ohio 1999)); *Flaig*, 2019 WL 6130864, at *3 (collecting cases). But, if a court determines that a jury would necessarily conclude that the hazard

was open and obvious, summary judgment is appropriate, as the premises owner has no duty. *Armstrong v. Best Buy*, 99 Ohio St. 2d 79, 788 N.E.2d 1088 (Ohio 2003).

An open and obvious hazard is one that is "in plain view and is readily discoverable upon ordinary inspection." *Bittner v. Wal-Mart Stores EAC, Inc.*, No. 3:16-cv-151, 2017 WL 2633189, at *3 (S.D. Ohio June 19, 2017); *see also, e.g., Szerszen v. Summit Chase Condos.*, 2010-Ohio-4518, 2010 WL 3722637, at *2 (Ohio Ct. App., 10th Dist.) ("Open and obvious dangers are not concealed and are discoverable by ordinary inspection."). Since "[t]he open and obvious nature of the hazard itself serves as a warning," the property owner "may reasonably expect that persons entering the premises will discover those dangers and take appropriate measures to protect themselves." *Bittner*, at *2; *see also Armstrong*, 788 N.E.2d at 1089 (same).

When determining whether a hazard is open and obvious, the question "is not whether [a plaintiff] observes the condition, but whether the condition is capable of being observed." *Nicoll v. Centerville City Schools*, 2018-Ohio-36, ¶ 15, 102 N.E.3d 1212 (Ohio Ct. App., 2d Dist.). That is, the test is not subjective (did this plaintiff in fact observe the condition?), but rather objective (would a reasonable person in the plaintiff's position have observed the condition?). *Armstrong v. Lakes Golf and Country Club, Inc.*, 2018-Ohio-1018, 98 N.E.3d 328, 335 (Ohio Ct. App., 5th Dist.).

There is one additional gloss on the open and obvious doctrine that IKEA addresses in its motion. In particular, if "attendant circumstances" exist, i.e., circumstances that interfere with a person's ability to apprehend the danger (e.g., some type of distraction), the open and obvious doctrine may not prevent recovery. *See Chilcutt v. Ford Motor Co.*, 662 F. Supp. 2d 967, 975 (S.D. Ohio 2009). To qualify as an attendant circumstance, the distraction must divert the attention of

the injured party, significantly enhance the danger of the defect, and contribute to her injury. *Horvath v. Walgreen Co.*, No. 3:10-cv-1684, 2012 WL 462976, at *4 (N.D. Ohio Feb. 13, 2012).

Here, IKEA contends that the undisputed facts show that the hazard was open and obvious and that no attendant circumstances contributed to Hernandez-Butler's injury. More specifically, IKEA argues that here the boxes were plainly visible, the warehouse was well-lit and clutter free, and that the area around the boxes was free of distraction. Given these facts, IKEA claims that, as a matter of law, it had no duty to Hernandez-Butler. Indeed, IKEA argues that this case is very similar to *McGee v. Lowe's Home Ctrs.*, 2007-Ohio-4981 (Ohio Ct. App., 7th Dist.), and *Hupp v. Meijer Stores Ltd. Partnerships*, 2006-Ohio-2051 (Ohio Ct. App., 5th Dist.), both cases in which the courts concluded as a matter of law that a given danger was open and obvious.

The principal problem with that argument is that IKEA appears to conflate two separate issues. The question is not whether *the boxes* were open and obvious, but rather whether *the hazard* that the boxes presented, when stored in a vertical position, on their shortest, narrowest side, and facing outward, was open and obvious.

The Court finds that this question raises a jury issue for at least four reasons. First, it is not clear that a reasonable customer, even if the customer could clearly see how the box was positioned, would appreciate the magnitude of the tipping risk that the box presented. To be sure, many people have a generalized awareness that setting a tall box on one of its short, narrow ends is not the most stable positioning of the box. For example, many people undoubtedly have experience at some point in their lives with lining dominoes on their short ends and setting off a chain reaction by tipping the first one. But it may be a stretch to extrapolate from the generalized awareness that people have that vertical positioning is less stable, and thereby conclude that a reasonable customer would have a strong sense of just how likely a given box is to tip. To be sure,

a jury ultimately *may* conclude that the likelihood of tipping here was open and obvious, but the Court does not believe that the jury necessarily *must* conclude that is the case. Thus, whether the hazard was open and obvious is a question for the jury.

That is particularly true in that it appears there is some evidence that the boxes were positioned so that they were hanging, at least to some extent, off the edge of the pallets on which they sat. By effectively narrowing the base further, such placement would increase the tipping potential, but both the extent of the overhang and the magnitude of the impact of that overhang on the tipping potential may not be immediately clear to a customer as she approaches the box.

In the Court's view, the nature of the risk here makes this case different from *McGee* and *Hupp*. In *McGee*, a plaintiff was shopping for pre-cut vinyl sheet flooring that the defendant had arranged vertically on an overhead shelf with a single support bar across the front of the samples. When the plaintiff attempted to remove the flooring she wished to purchase, the other vinyl sheet flooring samples fell and injured her. *McGee*, 2007-Ohio-4981, at ¶ 3. The trial court granted summary judgment on open and obvious grounds, and the appeals court affirmed, finding that "the precarious arrangement of the pre-cut vinyl sheet flooring was neither latent nor hidden. Any reasonable shopper should have appreciated the risk associated with removing merchandise from the display given the nature of its location and the arrangement of the pre-cut vinyl sheet flooring." *Id*.

Similarly, in *Hupp*, the Fifth District upheld the common pleas court's grant of summary judgment in favor of the defendant. There, a woman removed a rug that was rolled and stored vertically on the store's shelf and began to place it on the bottom of her shopping cart. As she was bent over, another rug fell and struck her. The rolled rug that struck her was also stored vertically, but rested on a shelf different from the one that supported the rug that she had moved to her cart.

The Fifth District reviewed photographs of the shelves and concluded that "a reasonable person would have appreciated the danger inherent in removing merchandise from the display shelf." *Hupp*, 2006-Ohio-2051, at ¶ 19. This was the entirety of the court's analysis.

Based on such cases, IKEA argues for the broad proposition that "in a retail environment, it is open and obvious that boxes may fall." (Defs.' Memo. in Opp. at 2). But that is not always the case, at least not as a blanket rule. To the contrary, as this Court has noted, "there appears to be no general consensus among Ohio courts on the question of whether falling merchandise is an open and obvious danger." *Weber v. Menard, Inc.*, No. 3:13-cv-229, 2014 WL 4965940, at *4 (S.D. Ohio Oct. 3, 2014). In *Weber*, this Court concluded that a triable issue existed where the defendant arranged and stacked products in a way that those products could foreseeably become dislodged and unstable, and that this hazard might not have been observable by reasonable inspection. In short, there is no general rule under Ohio law that renders the way in which merchandise is arranged an open and obvious danger as a matter of law. *See Burks v. Marc Glassman, Inc.*, No. 76676, 2000 WL 1714956 (Ohio Ct. App., 8th Dist.) (declining summary judgment because a genuine issue existed regarding whether headboards falling were caused by the plaintiff's failure to protect herself from an open and obvious condition or by the defendant's negligent stacking).

Moreover, in comparing the nature of the hazard here to those at issue in *McGee* and *Hupp*, the Court finds that the risk here is likely less obvious to a reasonable shopper. People have significantly more day-to-day experience with the risks associated with removing things from overhead shelves, like those at issue in *McGee*, where it is difficult to see the exact placement of objects and how they are in contact with one another, such that moving one item may inadvertently cause other nearby items to fall. In other words, ironically, the inability to see clearly the objects on such shelves may actually make the risk associated with moving those objects more open and

obvious. Separately, as a general matter, people have more experience interacting with items of the size, shape and weight of vinyl sheet flooring rolls (*McGee*), or rolled rugs (*Hupp*), than they do with moving 7'-tall, 18"-deep, 36"-wide, 150-pound sofa boxes. Indeed, most people likely have a general awareness that rolled rugs stored in a vertical fashion would be inherently unstable, as rugs lack a rigid structure, making them likely to bend or fall with little notice when stored vertically. Such items are different from the box here, which is not only much larger and heavier than items that people typically move, but which also has a structure (flat bottom, rigid sides) that people generally associate with stability, all else being equal.

Second, even if a person might be able to appreciate the risk of the box tipping by inspecting the entire box (thereby seeing just how narrow the base is in comparison to the box's height), here it is not clear that Hernandez-Butler had the opportunity to do so. It appears from the materials submitted with the summary judgment motion that the bays on either side of the Ektorp sofa bay may have been filled with other products. If that were the case, a customer approaching the bay containing Ektorp sofas may have had an obscured view of the lateral side of the sofa boxes. *See Cowgill v. Wal-Mart Stores, Inc.*, No. 2:16-cv-218, 2017 WL 4842404 (S.D. Ohio Oct. 26, 2017) (denying the defendant's motion for summary judgment because transparent cellophane that the plaintiff tripped over was hidden from his view by pallets). Thus, the customer may not realize how the depth of the box compared to the height of the box—an important comparison in assessing the stability of the box.

To be sure, Hernandez-Butler testified that she was aware of the dimensions of the box, but that is not necessarily the same as visually apprehending the box itself. And, in any event, as noted above, the question of whether the condition was open and obvious is an objective inquiry that turns on what a reasonable person would have observed about the dimensions of the box, not

on what Hernandez-Butler herself knew. (Of course, the latter inquiry conceivably may play into questions of comparative negligence; but that is a separate issue.) Again, a jury may conclude that a customer could see the lateral dimension of the box, and also conclude that this information would be sufficient to render the hazard open and obvious as to Hernandez-Butler, but a jury would not necessarily reach either of those results.

Third, whether a given box configuration is stable depends not only on the outward dimensions of the box, which may be apparent to the customer, but also on how things are placed within the box. A top-heavy, vertically-placed box would be less stable than a bottom-heavy, vertically-placed box. A customer, of course, would be unlikely to know the weight distribution within the box, meaning that the information that is available to the customer—the outward dimensions of the box—would not necessarily reveal the tipping risk. Indeed, if anything, a customer may conclude that the store would be unlikely to place the boxes in a vertical configuration if they would be unstable, and thus conclude that the weight placement within the box must be such that the boxes are stable in that position.

Fourth, and building on this latter point about customer expectations, even assuming a reasonable customer might perceive that the orientation of the Ektorp sofa box, in and of itself, *could* pose a tipping hazard, that same customer might also surmise that the store would not arrange the boxes in that manner without having addressed that risk. For example, a reasonable customer may conclude that, if the boxes present a tipping risk, the store would be using some kind of anti-tipping mechanism. Such mechanisms can be quite small (a moveable bracket at the top of a bay to prevent the boxes from tipping forward, a thin chain across the boxes, etc.), such that a person walking up to the boxes in a retail setting might assume that, even if she had yet to see the mechanism, it would likely be there if any appreciable danger of tipping had existed.

In other words, the mere fact of the vertical placement of the Ektorp sofa boxes would not necessarily signal to consumers the risk that the boxes may tip; the arrangement would not necessarily "serve as its own warning." *See Armstrong*, 788 N.E.2d at 1089. In this regard, the arrangement of the boxes is different from a classic example of an open and obvious danger, like a large hole in the floor. There, the danger of falling—and the lack of safety measures to prevent falling—would immediately be apparent to any reasonable observer approaching the hole. That is not so here. Again, a properly instructed jury may find on the facts here that the relevant danger is open and obvious, but on this record the Court cannot find it open and obvious as a matter of law.

Having concluded that there is a jury question as to whether the hazard was open and obvious, the Court need not reach the issue of attendant circumstances. That is because the latter issue (attendant circumstances) comes into play only as to hazards that have been deemed open and obvious. The notion surrounding the attendant circumstances doctrine is that even an open and obvious danger may not be open and obvious if the plaintiff is distracted by something else in the environment. *See Chilcutt*, 662 F. Supp. 2d at 975; *Horvath*, 2012 WL 462976, at *4. In other words, the purpose of an attendant-circumstances argument is to allow a plaintiff to overcome an open-and-obvious finding as to a particular hazard, and thus still rely on that hazard as a basis for recovery. But here, because the Court has not determined that the hazard was open and obvious as a matter of law, it is not necessary for Hernandez-Butler to show a genuine dispute as to attendant circumstances in order to avoid summary judgment.

> **2.** **IKEA Fails To Show That It Is Entitled To Summary Judgment On The Grounds That It Lacked Notice Of The Hazard.**

Separately, IKEA contends that another limitation on landowner liability entitles IKEA to summary judgment here. In particular, IKEA notes that, even if a danger is not open and obvious, a property owner's duty is limited to warning invitees of latent dangers of which it knows, as well

as of those dangerous conditions the owner could find based on reasonable inspection. (ECF No. 21 at PageID 98). Ohio courts have held that a party can satisfy this knowledge requirement by showing one of three conditions: (1) that the owner created the danger; (2) that the owner had actual knowledge of the danger and failed to give notice or address it; or (3) that the hazard existed for a sufficient period of time to justify an inference that the failure to warn against it or remove it was attributable to a lack of ordinary care. *Ray v. Wal-Mart Stores, Inc.*, 2013-Ohio-2684, at ¶ 22 (Ohio Ct. App., 4th Dist.). IKEA claims that the undisputed facts show that none of these conditions are met. The Court disagrees. Indeed, the Court finds that there are disputed issues of material fact as to each of the three showings.

### a. A Jury Could Find That IKEA Was Responsible For The Placement Of The Boxes.

Ohio courts hold that a property owner is liable for hazards that its own employees create. "[P]roof that the operator or [its] employees created the condition is proof that [it] had notice of [that condition]." *Tackett*, 2007 WL 2668133, at *2 (citing *Detrick v. Columbia Sussex Corp.*, 90 Ohio App. 3d 475, 629 N.E.2d 1081, 1083 (Ohio Ct. App., 2d Dist.)). In *Tackett*, this Court found that the defendant had notice of the hazard—a boxed bicycle that fell from a freestanding display— because the defendant was responsible for creating the display and stacking the boxes around it. *Id. See also Kubiak*, 725 N.E.2d 334, 337 (Ohio Ct. App., 3rd Dist.).

Here, as in *Tackett*, the defendant was responsible for creating the hazard that forms the basis for the plaintiff's claim. The testimony in the record suggests that the orientation of the boxes—resting on their shortest, narrowest edge, and faced so that, if they tip, they will tip into the customer aisle—was a choice that IKEA made. That is, the record indicates that the boxes were not originally arranged in some other orientation, and then moved by a previous customer into the orientation in which Hernandez-Butler found them. Rather, the evidence suggests this was the

orientation that IKEA chose. Thus, to the extent that the arrangement is problematic, IKEA may bear liability for it.

The issue of the overhang poses a somewhat different question. The record evidence from IKEA states that the boxes are always placed fully on the pallet. (See Pl.'s Ex. 11, ECF No. 25-11 at PageID 874). Gallinger, though, testified that all three of the front Ektorp sofa boxes in the bay were aligned with one another, and that each had the same overhang. That would be an odd result if the overhang was the result of various customers moving these individual boxes. At the very least, Gallinger's statement, if believed, suggests that IKEA employees, after one or more of the boxes had been moved, realigned them, so that they were all set evenly. Thus, a jury could infer from this evidence that it was IKEA, not individual customers, who created any overhang that existed at the time of the incident, and thus that, having created the hazard (if in fact it is one), IKEA is charged with notice of that placement.

**b.      A Jury Could Determine That IKEA Had Actual Or Constructive Notice.**

Turning to the second condition—whether IKEA otherwise had notice of the tipping hazard—Hernandez-Butler points out in her opposition that this is not the first time that an Ektorp sofa box has fallen on a customer. To the contrary, Hernandez-Butler attaches two incident reports involving the same sofa and a similar accident modality. To avoid issues raised by IKEA's Motion to Strike (see below), the Court will consider only one of these incident reports, but the Court finds that this incident report is sufficient to create a genuine dispute as to whether IKEA had notice of the propensity for sofa boxes to fall.

In its opposition to summary judgment, Hernandez-Butler attaches as Exhibit 14 an incident report from an occurrence in 2011 at the same IKEA store (the "Ferguson Incident"), in

which a customer was sitting on a pallet that contained a boxed Ektorp sofa oriented in the same fashion as the Ektorp sofa boxes here. The box fell forward and struck the customer on the head.

IKEA concedes that prior incidents can provide notice, but notes that is so only if the prior incidence is "substantially similar," and it argues that the Ferguson Incident does not pass that test—despite the fact that that incident involved the same boxed sofa, arranged the same way on a pallet.

To decide whether the previous incident is "substantially similar," the Court must first determine the source of the law that provides the rule of decision on that issue. In a federal diversity action, state law controls on substantive questions, but federal law controls on matters of procedure. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). The question of substantial similarity is, at least arguably, an evidentiary question as it goes to the admissibility of the prior incident as evidence of notice. *Laney v. Celotex Corp.*, 901 F.2d 1319, 1320 (6th Cir. 1999) ("In a diversity action, the admissibility of evidence is governed by the Federal Rules of Evidence but the sufficiency is governed by state substantive law."). On the other hand, one could argue that whether a prior incident is substantially similar is a substantive aspect of the premises liability claim, as it is one way of proving notice, which leads to liability. *Legg v. Chopra*, 286 F.3d 286, 289–90 (6th Cir. 2002) ("some state evidentiary rules have substantive aspects, thereby defying the substance-procedure distinction and creating a potential *Erie* conflict").

On balance, the former approach seems the correct one—Ohio's substantive tort law makes liability turn on whether the owner of the premises has actual or constructive knowledge of the hazard, and "substantial similarity" goes only to determining what evidence a party can use to establish such knowledge, meaning that federal law should apply. Happily, though, it matters little

here which law governs, as the rule is largely the same under both. And applying either, the Ferguson Incident is substantially similar to the accident here.

Under Ohio law, a prior incident is "substantially similar" so long as it has "a similarity in essential circumstances." *Robinson v. Goldman*, 1981 WL 5129 at *4 (Ohio Ct. App., 12th Dist., June 10, 1981) (citing *Cottman v. Federman*, 71 Ohio App. 89, 47 N.E.2d 1009 (9th Dist. 1942)). The Sixth Circuit, meanwhile, characterizes "substantially similar" under federal evidentiary law as meaning "that the accidents must have occurred under similar circumstances or share the same cause." *Rye v. Black & Decker Mfg. Co.*, 889 F.2d 100, 102 (6th Cir. 1989). The Sixth Circuit has cautioned against "too narrowly" defining similar circumstances. *Rimer v. Rockwell*, 641 F.2d 450, 465 (6th Cir. 1981). Thus, the rule does not require that incidents be identical, but only that there be, to use the language from a Tenth Circuit case, a "substantial similarity among the variables relevant to the plaintiff's theory of defect." *Smith v. Ingersoll-Rand Co.*, 214 F.3d 1235, 1248 (10th Cir. 2000). The Sixth Circuit has adopted this formulation, as well. *Clark v. Chrysler Corp.*, 310 F.3d 461, 473 (6th Cir. 2002) *reversed on other grounds*, 540 U.S. 801.

Applying either the state or federal standard to the facts here, the Ferguson Incident is substantially similar. It involved the same sofa, in the same box, oriented in the same fashion, falling forward in the same way, and striking a customer in a similar manner. To be sure, there are differences. There, the customer was sitting on the pallet, and was not moving an adjoining box, but the standard is "substantially similar," not "identical," and the Ferguson Incident passes muster in that regard.

### c.    A Jury Could Find That The Hazard Had Existed Long Enough That IKEA Should Have Known About It.

The final way in which a duty can arise under IKEA's own cited cases is if the hazard at issue has existed long enough to justify an inference that the failure to warn of, or address, the

hazard demonstrates a lack of ordinary care. Here, the same incident report that a jury could find provided IKEA notice might also form the basis for a jury finding in Hernandez-Butler's favor on this issue. In particular, the Ferguson Incident Report shows that IKEA had been using this arrangement of Ektorp sofa boxes at this store for at least four years (as the Ferguson Incident occurred in 2011 and the Hernandez-Butler accident occurred in 2015). A jury could reasonably find that four years should have been long enough for IKEA to recognize the tipping danger posed by this orientation of the boxes. Indeed, IKEA argues that the tipping hazard was "open and obvious," meaning that IKEA contends that a reasonable customer should have appreciated the risk immediately upon seeing the arrangement. For the reasons set forth above, the Court disagrees with that assessment. But, having argued that any invitee should have recognized the tipping hazard immediately, it strikes the Court as difficult for IKEA, whose employees arrange and manage the warehouse on a daily basis, to simultaneously argue that there is no reason to expect IKEA itself to have become aware of that same risk over at least a four-year span.

In short, a jury could find that IKEA should be charged with notice of the hazard based on any of the three conditions that IKEA itself has acknowledged as mechanisms for establishing notice, any one of which is sufficient to support a finding in Hernandez-Butler's favor. That distinguishes this case from those on which IKEA relies in its briefing. In *Riley v. Alston*, 2007-Ohio-5769, 2007 WL 3132131 (Ohio Ct. App., 3rd Dist.), for example, IKEA notes that the court found as a matter of law there was no evidence that the homeowners had any knowledge of the danger. (PageID 99). But the court made that finding because there the alleged hazard, wooden front porch stairs with a hidden "springing" floor board, had been in place for six years prior to the accident and no one had ever fallen or even "complained of losing their balance when walking on the steps before." *Id*. at ¶ 22. Here, though, as noted above, there is evidence that IKEA had

notice. And in *Taylor v. K-Mart*, 2007-Ohio-2094, 2007 WL 1288546 (Ohio Ct. App., 2d Dist.), there was no evidence as to the condition at issue there—a single puddle of liquid of unknown origin at the store entrance—that K-Mart had created the puddle, that it had knowledge of the puddle, or that the puddle had been there for a sufficient time that K-Mart should have discovered it. Here, though, as discussed above, a jury could find that any or all of those three elements are present as to IKEA. Accordingly, the Court finds that there is a jury question as to whether a duty existed.

3. **IKEA Fails To Show The Absence Of A Genuine Dispute Regarding Whether Its Arrangement Of The Ektorp Boxes Met All Applicable Standards Of Care.**

IKEA's third argument for summary judgment—that its expert has opined that IKEA met all retail standards, and thus there was no breach—merits only brief mention. To be sure, *IKEA's* expert has opined along the lines that IKEA suggests, but Hernandez-Butler has also retained an expert, and that expert opined that IKEA breached at least one applicable industry-recognized standard of care in arranging the Ektorp sofa boxes in the manner that it did. In particular, according to Hernandez-Butler's expert, industry standards provide that boxes should not be arranged in such a manner that their height is more than three times the width of the base. (Pl.'s Ex. 13, ECF No. 25-13 at PageID 892). Here, the box had an 18" depth, but a vertical height of 86", well over what her expert says is the maximum industry-prescribed ratio of 3.5.

This strikes the Court as a classic battle-of-the-experts issue that will be left to the jury to resolve after the presentation of evidence, not a matter for the Court to decide on the papers.

4. **IKEA Has Not Shown That It Is Entitled To Summary Judgment On Causation Grounds.**

Finally, IKEA contends that Hernandez-Butler has failed to provide any evidence of what actually caused the sofa box to fall, and thus cannot meet her burden of proof on causation.

Hernandez-Butler's only response to this is to note that she has provided evidence on what created the *risk* of falling, and that she need not provide evidence of the force that actually brought that risk to pass. Indeed, at argument, Hernandez-Butler's counsel conceded that there is no evidence in the record as to what precipitated the box actually falling here—in other words, what force acted on the box to cause it to start moving. Thus, if Hernandez-Butler bears the burden of identifying that force, she loses on the record here.

This presents an interesting question. To be sure, a plaintiff bears the burden of establishing that a defendant's breach of a duty was both the—or at least "a"—but-for cause and proximate cause of the injuries that the plaintiff suffered. The question, though, is what does this requirement of proving causation mean in the context of a vertically-oriented box falling over? Does evidence of the risk associated with a given orientation (i.e., that the box can easily fall in a particular direction), coupled with the fact that identified risk actually came to pass (i.e., that the box fell in exactly the manner contemplated by the identified risk), suffice to meet the plaintiff's burden, or must she prove something more? After all, even an unsafely positioned box will not fall absent some force acting on it. Thus, evidence of the "cause" of the fall could be understood as requiring more than merely identifying what made a fall likely to occur; perhaps a plaintiff must show what actually caused the fall to occur—at least that is IKEA's position.

Although the parties did not cite any case law on this issue, it appears that Ohio courts have rejected IKEA's preferred approach. In *Cione v. K-Mart Corporation*, No. C-970475, 1998 WL 226418 (Ohio Ct. App., 1st Dist.), an unrestrained, wheeled computer cart rolled off a shelf and struck a shopper in the head. After a verdict in the plaintiff's favor, the trial court granted a JNOV, finding that "there was no evidence to demonstrate what caused the cart to fall," in other words it was "not clear what actually put the cart in motion." *Id.* at *2. The appellate court reversed,

however, saying that it was enough that the plaintiff had shown "that the cart had wheels, that [the store owner] displayed the cart on a high shelf, and that the cart had nothing to keep it from rolling off the shelf." *Id*. at *3. Because the jury could find that it was "foreseeable to [the proprietor] that an unrestrained piece of furniture displayed on a sagging shelf could roll off and cause injury," identifying that hazard was sufficient to support a verdict in favor of the injured patron. *Id*. "[A]lthough it was not clear what actually put the cart in motion, … any such cause was foreseeable and connected with the way in which [the proprietor] displayed the cart." *Id*. In other words, demonstrating the risk, coupled with a showing that the events unfolded in the way contemplated by the risk, is a sufficient showing of "cause."

*Weber* reflects the same reasoning. There, like here, the defendant had argued "that summary judgment [was] warranted because [the plaintiff] ha[d] not identified exactly what caused the [product] to fall from the bin." *Weber*, 2014 WL 4965940, at*6. That is, like here, the plaintiff was unable to identify the force that caused the products to begin moving off the shelf. The defendant there relied on *Lacy v. Wal–Mart Stores, Inc.*, 2012-Ohio-1690,, 2012 WL 1307075 (Ohio Ct. App., 7th Dist.), a case in which the court granted summary judgment to the defendant where a display shelf at the defendant's store had broken, causing a monitor to fall, but the plaintiff had no evidence as to why the shelf broke.

The *Weber* court nonetheless denied summary judgment to the defendant on causation grounds, finding that the plaintiff had "specifically identified the proximate cause of their injuries," which was "the negligent stacking of the stove pipes," i.e., stacking the products in a way that made them likely to fall. *Weber*, 2014 WL 4965940, at *6. In other words, *Weber*, like *Cione*, suggests that in cases involving retail products that are stacked in an unsafe fashion and fall, the

unsafe stacking itself is a sufficient cause of the product falling. *Id*. No showing as to the force that actually triggered the fall is needed to establish causation.

Not only is that approach reflected in case law, but it makes sense. After all, the typical reason that a given box orientation is deemed "unsafe" is that the force associated with causing the box to fall is small in comparison to the weights involved. Imagine for example, that a box is oriented such that the slightest nudge would be enough to send it toppling, perhaps even the breeze caused by a customer walking past. In such cases, a box almost may appear to move "by magic," and it would not be surprising that the customer who was struck by such a box may not be able to identify what created the (relatively minimal) force needed to start the chain of events.

To be sure, here Hernandez-Butler's own expert appears to suggest that roughly a seven-pound force would have been necessary to start the box tipping if it was sitting flat on the pallet. (ECF No. 25-13 at PageID 890). And, while seven pounds is not a major force, it seems likely it is a level of force that someone would remember causing, for example, by bumping the box. At the same time, the qualifier—if the box is sitting flat on the pallet—perhaps bears some additional scrutiny. Gallinger testified that the box was not sitting fully on the pallet, but rather was hanging over the edge. He has equivocated on the amount of that overhang (sometimes suggesting it was three to four inches, and other times six to eight), but he has been consistent in maintaining that there was some overhang. That becomes important as, if the boxes were extended forward over the edge of the pallet, then the effective depth of the base was less than 18", meaning in turn that less force would be required to start the box toppling forward. Depending on the extent of the overhang and the lateral weight distribution in the box, perhaps so little force was needed that Hernandez-Butler or Gallinger inadvertently bumped the box so slightly that they don't even recall

doing it, or in the process of moving the middle box, that box brushed without their knowledge against the box that fell.

Separately, Hernandez-Butler's counsel also noted at argument that his client received a blow to the head when the box fell on her. He argued that it may well be the case that her memory of the event was clouded as a result, and that this is what is interfering with her ability to provide details regarding the precise mechanism of the fall.

Whatever actually occurred, while the Court agrees that the sofa box did not begin moving on its own, the Court finds that Ohio law does not require Hernandez-Butler to establish what initiated the fall. Rather, the evidence of the risk created by the positioning of the box (i.e., in such a manner that it could easily fall forward with a relatively light application of force), coupled with the fact that this exact risk materialized, and became the event that allegedly harmed Hernandez-Butler, could provide sufficient evidence for a jury to find causation, and thus suffices to allow Hernandez-Butler to avoid summary judgment on that issue. *See Cione*, 1998 WL 226418, at *2–3; *see also Weber*, 2014 WL 4965940, at *6–7.

For all of these reasons, the Court **DENIES** IKEA's Motion for Summary Judgment (ECF No. 21).

### C.    Analysis Of IKEA's Motions To Strike.

As noted immediately above, in addition to moving for summary judgment, IKEA filed two motions to strike, citing Rule 12(f). The Court denies those motions for three reasons.

First, it is not clear that Rule 12(f) is a permissible procedural vehicle for attacking exhibits at the summary judgment stage. As Hernandez-Butler observes, Rule 12(f), by its very language, is directed toward "pleadings," a term that has a clear meaning under the Federal Rules of Civil Procedure. That definition, as a general matter, does not include evidentiary materials submitted

in connection with summary judgment. To be sure, a party is free to argue that the materials the other party has submitted do not constitute admissible evidence, and thus are insufficient to create a genuine dispute, *see* Fed. R. Civ. P. 56(c), but that is a matter better addressed in the summary judgment briefing itself, or an accompanying Rule 56(c)(2) motion, rather than through a filing labeled a motion to strike under Rule 12(f). While IKEA has identified some cases in which courts apparently considered such evidentiary issues at summary judgment in response to filings labeled Rule 12(f) motions, in light of that Rule's plain language, the Court finds cases such as *Fox v. Michigan State Police Dep't*, 173 F. App'x 372, 375 (6th Cir. 2006), and *Hurst v. Ohio Dep't of Rehab. & Corr.*, No. 2:11-cv-1090, 2014 WL 3889471 (S.D. Ohio Aug. 7, 2014), which reject the appropriateness of Rule 12(f) for such purposes, to be better reasoned.

Even putting that technicality aside, the motions fail for other reasons. The motion directed toward the Renton Incident Report is moot. The Court need not, and did not, rely on the Renton Incident Report in denying summary judgment. Of course, if Hernandez-Butler intends to introduce that report at trial, IKEA remains free to raise its evidentiary concerns at that time, either through a motion in limine before trial, or through an objection at trial. But the Court need not resolve that matter now, and thus it declines to do so.

The motion directed at the Gallinger testimony, meanwhile, fails on the merits. In essence, IKEA argues that Gallinger's testimony should be struck because his second deposition directly contradicts his first deposition, allegedly rendering his testimony unfit for consideration at the summary judgment stage. For this proposition, IKEA relies on *Aerel, S.R.L. v. PCC Airfoils, LLC*, 448 F.3d 899 (6th Cir. 2006), which holds that a party cannot create a genuine dispute by submitting an affidavit at the summary judgment stage that contradicts the party's deposition testimony. That case lends no support to IKEA's argument, however, for multiple reasons. First,

*Aerel* addresses whether a *party* may submit an affidavit that contradicts the *party's* own deposition testimony. *Id*. at 906. Here, Gallinger is not a party, and thus falls outside the operation of the rule that the *Aerel* court cited. Second, the *Aerel* rule is directed at an affidavit that is filed with the non-moving party's opposition to summary judgment, and that contradicts earlier deposition testimony. *Id*. at 908. Here, there were two depositions, with the latter deposition allegedly contradicting the former. That is an important distinction under *Aerel's* reasoning. The Sixth Circuit in *Aerel* specifically noted the unfairness that would result if a party drafted its summary judgment motion based on the deposition testimony, only to first learn when the opposing party filed its opposition that the opposing party was now disputing the set of facts to which the party had testified. *Id*. at 909. Here, of course, both the first deposition and the second deposition occurred before IKEA filed its motion, so this is not the kind of after-arising-facts situation that was addressed in *Aerel*.

Third, it is not clear that *Aerel*, even if it applied, would bar reliance on Gallinger's testimony here. In *Aerel*, the Sixth Circuit held only that the later statement could not be used to in "an attempt to create a sham issue of fact." *Id*. at 908 (citing *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986)). That determination, according to the court, turned on a variety of factors, including whether "the affiant had access to the pertinent evidence at the time of his earlier testimony." *Id*. at 909 (quoting *Franks*, 796 F.2d at 1237). Here, Gallinger did not have access to his insurance investigation statement at the time of his first deposition, and the second deposition was largely directed at allowing him to clarify any discrepancies between his first deposition and that statement. Similarly, in resolving the sham-fact issue, the Sixth Circuit also directed courts to consider "whether the earlier testimony reflects confusion [that] the [newer testimony] attempts to explain." *Id*. Once again, Gallinger's second deposition appears to meet this factor.

Finally, the motion to strike the Gallinger testimony, like the motion directed at the Renton Incident Report, is also moot. The Gallinger materials were not strictly necessary to the Court's holding denying summary judgment. To be sure, the Court relied, to some extent, on Gallinger's testimony that the boxes were hanging over the edge of the pallets as at least an alternative reason supporting the Court's finding on causation. But the Court relied at most on the *fact* of the overhang, not the *extent* of it, in reaching that result, and Gallinger's testimony throughout has been consistent that there was at least some overhang, although admittedly his characterization of the magnitude has changed at various points. At trial, IKEA will be free to use his varying accounts of that overhang, or his varying accounts of any other aspects of the incident, to impeach his credibility. At this juncture, however, the Court declines to strike the testimony.

Accordingly, the Court **DENIES** IKEA's Motion to Strike the Renton Incident Report (ECF No. 28) and **DENIES** IKEA's Motion to Strike or Disregard Gallinger's Testimony (ECF No. 29).

## IV.  <u>CONCLUSION</u>

For the reasons set forth above, the Court **DENIES** IKEA's Motion for Summary Judgment (ECF No. 21), **DENIES** IKEA's Motion to Strike the Renton Incident Report (ECF No. 28), and **DENIES** IKEA's Motion to Strike or Disregard Gallinger's Testimony (ECF No. 29). The Court sets this matter for a status conference on February 12, 2020, at 10:30 a.m. At that status conference, the parties should be prepared to discuss dates for the final pretrial conference and trial.

**SO ORDERED.**

January 27, 2020
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**